Filed 5/16/13  In re S.W. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re S.W. et al., Persons Coming Under the Juvenile Court Law. | |
| | D062651 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. EJ01758A-F) |
| v. | |
| ANDRE P. et al., | |
| Defendants and Appellants; | |
| S.W., | |
| Appellant. | |

APPEALS from orders of the Superior Court of San Diego County, Ronald F. Frazier,

Judge.  Affirmed.

Lelah S. Fisher, under appointment by the Court of Appeal, for Defendant and

Appellant Andre P.

Rosemary Bishop, under appointment by the Court of Appeal, for Defendant and

Appellant R.S.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant V.W.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Paula J. Roach, Deputy County Counsel, for Plaintiff and Respondent.

Valerie N. Lankford, under appointment by the Court of Appeal, for Appellant, a Minor, S.W.

This case involves the six minor children of V.W.: 13-year-old S.W., 11-year-old David S., 10-year-old Donovan P., eight-year-old Estella P., six-year-old Michael P. and three-year-old Raymond S. (collectively, the minors). The appellants are V.W., S.W., Andre P., who is the father of Donovan, Estella and Michael, and R.S., who is the father of Raymond.

V.W. appeals the juvenile court's order denying her petition for modification under Welfare and Institutions Code section 388,[1] by which she requested to have the minors returned to her custody. She also appeals orders terminating her parental rights to the five youngest minors, contending that there was no substantial evidence to support the court's findings that the beneficial parent-child relationship or beneficial sibling relationship exceptions to adoption did not apply to preclude terminating parental rights. In her appeal, S.W. contends that the court erred by: (1) denying her section 388 modification petition, in which S.W. sought to have herself and her five siblings returned to V.W.'s custody; and (2) declining to apply the sibling relationship exception to adoption for her siblings. Andre contends that the court should have found that the beneficial parent-child and sibling relationship exceptions applied to preclude terminating parental rights as to his children, and

---

[1]     Statutory references are to the Welfare and Institutions Code unless otherwise specified.

2

also joins in the arguments of V.W. and S.W. to the extent they benefit him. R.S. joins in V.W.'s and S.W.'s arguments to the extent they inure to his benefit regarding Raymond. We affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

In 1999, V.W. became a dependent of the juvenile court at the age of 14 because of the maternal grandmother's drug use. V.W. was seven months pregnant with S.W. at the time, and had previously been arrested for possessing methamphetamine and drug paraphernalia. After S.W. was born, V.W. continued her drug use and criminal lifestyle, and was unable to care for S.W. In January 2000, the court declared S.W. a dependent under section 300, subdivision (b), removed her from V.W.'s custody, placed her with the maternal grandmother and ordered V.W. to participate in reunification services. After V.W. successfully participated in services, S.W. was returned to her custody and the court terminated its dependency jurisdiction. S.W. went to live with the maternal grandmother.

V.W. gave birth to David in July 2001.[2] She married Andre in 2003, and they had three children: Donovan (born in 2003), Estella (born in 2004) and Michael (born in 2006). Between 2002 and 2007, V.W. was arrested numerous times for crimes such as possessing a controlled substance for sale and grand theft. Despite the fact that V.W. had obtained restraining orders against Andre, they engaged in domestic violence and Andre was convicted of battery on a spouse.

The San Diego County Health and Human Services Agency (Agency) continued to receive referrals because of ongoing domestic violence between V.W. and Andre, V.W.'s drug

---

[2] David's father is not a party to this appeal.

3

use and her neglect of the children. In March 2008, Agency removed S.W., David, Donovan, Estella and Michael from their home, which was filthy and contained many hazards. The children were dirty and had lice, and David had an injury above his eye, which he said was caused when V.W. hit him. The children were eventually returned home and the case was closed after V.W. complied with the provisions of a voluntary services contract.

By February 2009, V.W. was in a relationship with R.S. She gave birth to their son Raymond the following November. A month later, police responded to a physical altercation between V.W. and R.S. There had been many other domestic violence incidents between them during the year. From January through March 2010, Agency received six referrals involving the minors, primarily because of domestic violence and V.W.'s drug and alcohol abuse. Although V.W. denied that there had been any domestic violence with R.S., the minors reported having witnessed physical altercations.

In March 2010, V.W. tested positive for methamphetamine and alcohol, and was temporarily detained in a mental health facility. She was being evicted from her apartment, which had no electricity or running water. The maternal grandmother had been the minors' primary caregiver because V.W. often left the minors with her. S.W. considered the maternal grandmother to be her mother, and viewed V.W. as a sister. In April, Agency filed dependency petitions in the juvenile court on behalf of the six minors. The court sustained the allegations of the petitions, declared the minors dependents, removed them from parental custody and placed them in out-of-home care.

V.W. admitted that she is an alcoholic. She began inpatient treatment, but stopped attending within two months. Andre was serving a 21-month sentence for attempted murder.

4

V.W. was living with the paternal aunt, and the court authorized V.W. to have a 60-day trial visit with S.W., Estella and Donovan.

After R.S. served his sentence for a spousal abuse conviction, he moved in with the maternal grandmother. His parole conditions prevented him from contacting V.W. for one year. He left his parolee release program after two days and his whereabouts became unknown. A short time later, V.W. moved back to the apartment complex where the maternal grandmother lived. Agency learned that V.W. was having contact with R.S. while S.W., Estella and Donovan were present. V.W. and R.S. engaged in another incident of domestic violence in the children's presence. S.W., Estella and Donovan were removed from V.W.'s custody and visits were required to be supervised. V.W. then became homeless.

According to a report prepared for the six-month review hearing, V.W. stopped attending her domestic violence treatment program when she learned that R.S. had been released from custody. She said that it was unfair that she was prohibited from seeing him. V.W. left her job skills program, did not participate in in-home support services and failed to complete three different drug treatment programs. She was terminated from individual therapy due to excessive absences, but returned to therapy just prior to the six-month hearing. The therapist noted that V.W. was intent on seeing R.S. The social worker noted that during a recent visit with the minors, V.W. smelled of alcohol and was loud, argumentative and demanding, which caused the social worker to believe that V.W. had relapsed. The court terminated V.W.'s services and set a hearing under section 366.26 to select and implement permanent plans for the minors.

5

Agency began a search for an adoptive placement for all six minors. The court granted a continuance of the selection and implementation hearing to allow Agency more time to find an appropriate adoptive home. In the meantime, R.S. was released from custody and V.W. resumed her relationship with him. The police were called to the home on two occasions because of V.W.'s intoxication and domestic violence between V.W. and R.S.

S.W., who was 12 years old at the time, did not want to be adopted.[3] Social worker Genny Wrocklage recommended adoption for the five youngest minors. Because S.W. objected to being adopted, Wrocklage recommended another planned permanent living arrangement (APPLA) for her. Agency had recently identified a family, Joe and Dana D. (together, the caregivers), who were committed to adopting the minors. The caregivers had finalized their adoption home study, and they began visits with the minors in April 2012. They were willing to also adopt S.W., but understood and respected S.W.'s wish not to be adopted. The caregivers had a bed in their home for S.W. and said that she was welcome to stay with them or visit her siblings whenever she wanted. S.W. was regularly visiting her siblings and the caregivers, and wanted to continue doing so.

In Wrocklage's opinion, each of the five youngest minors had a beneficial parent-child bond with V.W., to varying degrees. These children knew V.W. as their mother and loved her very much. However, because the children had been raised by the maternal grandmother and other family members, and had spent the last two years in foster care, they did not have a "traditional" or "true" parent-child bond with V.W. Moreover, V.W. was still unable to provide safety and stability for her children. She did not understand the risks and dangers of

_____

3       Under section 366.26, subdivision (c)(1)(B)(ii), the court may not terminate parental rights as to a child 12 years of age or older if that child objects to termination of parental rights.

domestic violence, or how her codependency and poor choices in men negatively impacted the minors. Her continued use of alcohol impaired her ability to think clearly and to make positive choices for herself and her children. In Wrocklage's view, the five youngest minors could achieve stability only through adoption.

Regarding the sibling bond, Wrocklage reported that the six minors were a "tremendously strongly bonded sibling group." The sibling relationship among the five youngest minors would be maintained because they would all be adopted by the caregivers. Adoption would not interfere with the relationship S.W. had with her siblings because even though S.W. objected to adoption, the caregivers intended to include her as part of the family. Moreover, the five youngest minors' need for a stable, nurturing family life outweighed the benefit they would receive by maintaining a relationship with S.W.

The five youngest minors began transitioning to the caregivers' home. Michael and Raymond were extremely comfortable there and called their caregivers "Mommy" and "Daddy." David and Donovan were becoming more comfortable with the idea of being adopted by the caregivers, and seemed to understand that being adopted by the caregivers was a good opportunity for them. However, if given a choice, they preferred to return to their mother. Estella had been doing well with the caregivers and said that she wanted to be adopted. She was afraid that if she went back to her mother's home, she would be removed again, and she did not want to go through that experience.

In May 2012, V.W. filed a section 388 petition for modification seeking to have the minors returned to her care, or alternatively, to have unsupervised visits with S.W. The

7

petition alleged that V.W.'s circumstances had changed and that the proposed modification was in the minors' best interests.

Agency recommended that the court deny V.W.'s petition because although V.W. had completed drug treatment and attended therapy, she had not maintained her sobriety; she remained in a codependent relationship with R.S. and continued to engage in domestic violence with him; and she had not completed a required 52-week domestic violence course.

At a hearing on V.W.'s section 388 petition, David testified that he missed V.W. and wanted to go home to her,[4] but his second choice was a one-year guardianship with the caregivers. Donovan testified that he would feel safe living with V.W. because she would not leave him home alone. Donovan had been visiting the caregivers and the visits had been going very well. He felt comfortable with them. Donovan said that he missed V.W. and wanted to return to her care. The caregivers explained to him that if he were adopted, he could visit V.W. once a month and talk with her on the telephone whenever he wanted. Donovan said that he liked being with his siblings during visits. If he lived with the caregivers, he wanted to continue visiting V.W. and S.W.

S.W. testified that she did not want to be adopted. She said that she loved V.W. and wanted to live with her and the maternal grandmother. S.W. believed that V.W. had changed because she had completed all of her classes and seemed more involved with her children. S.W. did not want her siblings to be adopted and she wanted to live with them in V.W.'s home. She would be sad and hurt if she could not continue to see them.

---

[4]     In his stipulated testimony, David said that he wanted to go home to V.W. because he believed that she had changed.

8

Following this testimony, minors' counsel, who had been representing all six minors, stated that she had a conflict. The court appointed three separate attorneys for the minors: one for S.W., one for David and Donovan, and one for Estella, Michael and Raymond. The court declared a mistrial and set a new hearing date.

By the end of June 2012, all five of the youngest minors were living with the caregivers. They had adjusted well to this home. Michael and Raymond had a very strong bond with the caregivers. Estella continued to strongly advocate for adoption and was happy and excited about her new home. Shortly after Donovan moved in with the caregivers, he had a change of heart and now wanted to be adopted. He loved his caregivers, as well as his mother. David said that he wanted to be adopted by the caregivers but also wanted to be with his mother. V.W. met with the caregivers and they discussed the possibility of V.W. visiting the minors once a month and telephoning them twice a week. V.W. was considering allowing the adoption to occur because she wanted to break the cycle of poverty for her children.

Social worker Wrocklage decided that the visits between S.W. and the five youngest minors should be supervised until the trial was over because it appeared that S.W. was trying to sabotage her siblings' adoptions. S.W. became very upset by Wrocklage's visitation restrictions, which in turn caused the siblings to feel guilty and torn because they knew that S.W. did not support their adoptions. S.W.'s relationship with the paternal aunt, with whom S.W. had been living, began to deteriorate because the aunt supported adoption of the five youngest minors. Consequently, Wrocklage was looking to change S.W.'s placement.

In August 2012, S.W. filed a section 388 petition for modification seeking to have the court return her and her siblings to V.W.'s custody. At a combined hearing on S.W.'s and

V.W.'s section 388 petitions, the court received in evidence Agency's various reports and the prior testimony of David, Donovan and S.W. David testified again, and said that living with the caregivers was great. Although he envisioned himself living there on a permanent basis, he wanted the judge to decide whether he should be adopted. David testified that he wanted continued contact with S.W. and V.W. He wanted to live with his mother someday, perhaps when he was 18 years old or in college. David had been visiting S.W. about once a week, and he would miss her if he could not see her every week. If he were adopted by the caregivers, he trusted them to decide whether it was best for him to see V.W. and to visit S.W.

Donovan testified that he wanted to continue living with the caregivers. He said that he would be fine living with either the caregivers or with V.W. Although Donovan stated that he would be comfortable staying with the caregivers for his entire childhood, he wanted the judge to decide whether he should be adopted. Donovan said that he was visiting S.W. once a week, and he would be sad if he could not continue to see her because they were best friends. He would be upset if he could no longer see V.W., but he trusted the caregivers to decide how often he visited her and S.W.

S.W. testified that she was not confident that she would remain part of her siblings' lives if they were adopted. Now that visitation with her siblings had been restricted, she felt pushed away, and this made her feel sad, depressed and stressed. S.W. said that she would like to return to having overnight visits in the caregivers' home. She believed that her siblings were happy living there, but they told her that they missed V.W. S.W. wanted all of them to return to V.W.'s custody.

10

V.W. testified that her entire life had changed because she had graduated from drug treatment; attended therapy for more than a year; participated in a domestic violence group program; and attended Narcotics Anonymous (NA) and Alcoholics Anonymous meetings twice a week. V.W. said that she had a sponsor and was reworking the 12-step program. Although she had not completed a 52-week domestic violence treatment program, she said that she would no longer allow domestic violence to be part of her life.

V.W. further testified that she had been clean and sober for the past seven months, ever since she completed her drug treatment program. She maintained that the domestic violence that she had experienced was not her fault, but admitted responsibility for exposing her children to it. However, V.W. did not believe that all of the children had been affected by the violence. She said that she had not been in a relationship with R.S. since he went to prison. V.W. had been living alone in a three-bedroom apartment for four months, and she had beds for all six children. She paid for the apartment by working several jobs and by getting financial help from family members. V.W. believed that it was in the minors' best interests to be returned to her custody because she loved them and they were bonded with each other.

Wrocklage testified that she continued to recommend against returning the minors to V.W.'s custody. Even though V.W. had participated in individual therapy, she had not addressed all of her issues, and she repeated her pattern of dishonesty, in that she was missing visits with the minors and having a relationship with R.S. Based on Wrocklage's experience working with people in recovery, she did not believe that V.W. had remained clean and sober, or that she had sufficiently resolved her issues with domestic violence. V.W. had experienced chronic and pervasive domestic violence with all four fathers of the minors, as well as with her

11

own family members. In Wrocklage's opinion, the minors would be at risk if returned to V.W.'s custody because there had been multi-generational substance abuse and domestic violence, and because the minors had been removed from parental custody multiple times. Wrocklage believed that V.W. would continue to prioritize men over her children and expose the minors to domestic violence.

Wrocklage stated that the caregivers were committed to an open adoption, which meant that they were willing to allow the minors to maintain contact with members of their biological family. Wrocklage believed that an open adoption was important in this case and that it was a "perfect fit" for these children. However, even if the five youngest minors had no further contact with their biological family, Wrocklage still believed that adoption was the appropriate permanent plan for them.

After the court considered the evidence and arguments of counsel, it took the matter under submission. The court denied S.W.'s and V.W.'s section 388 petitions, finding that neither of them had shown that V.W.'s circumstances had changed or that the proposed modification was in the best interests of S.W. or the five youngest minors. However, the court did grant V.W.'s request for unsupervised visits with S.W.

The court ordered APPLA as S.W.'s permanent plan. As to the five youngest minors, the court found that the benefits of adoption outweighed maintaining the parent-child bond or the sibling bond. The court terminated parental rights and referred the five youngest minors for adoptive placement.

DISCUSSION

*V.W.'s Appeal*

I

V.W. contends that the court erred by denying her section 388 petition.  She asserts that she met her burden of showing that her circumstances had changed, primarily between May 2011 and May 2012, because she had sufficiently mitigated or ameliorated the identified risks to the minors.  She further asserts that it would be in the best interests of S.W. and the five youngest minors to be returned to V.W.'s custody.[5]

A

Under section 388, a party may petition the court to change, modify or set aside a previous court order.  The petitioning party has the burden of showing, by a preponderance of the evidence, that there is a change of circumstances or new evidence, and that the proposed change is in the child's best interests.  (§ 388; *In re Jasmon O.* (1994) 8 Cal.4th 398, 415-416.)  Whether a previous court order should be modified and a change would be in the child's best interests are questions within the sound discretion of the juvenile court.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318; *In re Casey D.* (1999) 70 Cal.App.4th 38, 47.)  Exercises of discretion must be " 'grounded in reasoned judgment and guided by legal principles and [legal] policies appropriate to the particular matter at issue.' [Citation.]" (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977.)  Thus, although the abuse of discretion standard is deferential, "it is not empty." (*People v. Williams* (1998) 17 Cal.4th 148, 162.)  The standard "asks in substance whether the ruling in question 'falls outside the bounds of reason' under the

---

[5]     R.S. joins in this argument with respect to Raymond.  Andre joins in this argument with respect to Donovan, Estella and Michael.

applicable law and the relevant facts [citations]." (*Ibid.*) When two or more inferences reasonably can be deduced from the facts, we may not substitute our decision for that of the juvenile court. (*In re Stephanie M.,* at pp. 318-319; *In re Casey D.*, at p. 47.)

B

V.W. asserts that she demonstrated that her circumstances had changed because she had: (1) remained sober for a lengthy period of time and was no longer at risk of abusing drugs or alcohol; (2) completed many programs and had significant insight into her problems; (3) ended her relationship with R.S. and would no longer expose her children to domestic violence; and (4) acquired an appropriate home for her children and was prepared for their return. However, V.W.'s petition and supporting documentation showed that although she had made some notable improvements, her circumstances had not changed, but instead, were "changing." (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 47.)

In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case. (*In re Justice P*. (2004) 123 Cal.App.4th 181, 188-189.) The evidence showed that V.W. had a 14-year history of substance abuse and domestic violence. She was unable to remain clean and sober even after having participated in drug and alcohol treatment a number of times. Although V.W. did participate in and complete a substance abuse program between July 2011 and January 2012, she had no relapse prevention plan and she provided no proof of having attended NA meetings after March 3, 2012. Significantly, the police were called to V.W.'s home and documented that she was intoxicated in December 2011 and again in January 2012. Thus, the court could reasonably disbelieve V.W.'s testimony that she had been sober for an extended period of time,

14

and instead find that V.W. remained at risk of relapse.[6] (See *Laura B. v. Superior Court* (1998) 68 Cal.App.4th 776, 780 [although mother completed at least three drug treatment programs, her relapse showed resistance to treatment].)

Further, V.W. had not sufficiently addressed issues of domestic violence. Every relationship that V.W. had been in, beginning at the age of 14, involved domestic violence. Even when faced with the prospect of having her parental rights terminated, V.W. chose to remain in a violent relationship with R.S. She stopped attending domestic violence treatment and resumed contact with R.S. following his release from custody for spousal abuse, and they engaged in further acts of domestic violence in December 2011 and January 2012. As of April 2012, R.S. was still a part of V.W.'s life.

V.W. claims that she now has insight and that she would no longer expose her children to domestic violence. However, she never completed domestic violence treatment to explore the cycle of violence and develop a safety plan. V.W. was terminated from a treatment program because she was unable to apply what she had learned.[7] She told her therapist that she would not allow violent people in her home or near her children, but then "self-sabotaged" by having contact with R.S., who remained untreated for domestic violence. Although V.W. was eventually able to articulate what she had learned and she claimed that she had taken responsibility for her conduct, her pattern of drinking and fighting with R.S. permitted a

---

[6] Even if V.W. remained sober between January and September 2012, eight months of sobriety is not, as she characterizes it, "a lengthy period of time" given her extensive history of substance abuse.

[7] One example of V.W.'s lack of insight was her belief that all the children were not affected by the violence.

15

reasonable inference that her circumstances had not in fact changed. (See *In re Brooke C.* (2005) 127 Cal.App.4th 377, 383.) The court was entitled to accept Wrocklage's opinion that V.W. would continue to prioritize men over her children and expose the minors to domestic violence.

Despite having acquired a three-bedroom home that would accommodate all of her children, V.W. failed to show that she was ready to parent them. On this record, the court could reasonably find that V.W. had not rehabilitated sufficiently to warrant returning the minors to her custody. A petition like V.W.'s that demonstrates changing, rather than changed, circumstances does not promote stability for the child or the child's best interests because having to wait to see whether the parent's circumstances stabilize would mean delaying the selection of a permanent plan to see if the parent, who has failed to reunify with the child, might be able to reunify at some future point. (*In re Casey D., supra*, 70 Cal.App.4th at p. 47.) "Childhood does not wait for the parent to become adequate." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 310.)

C

Even if V.W. had shown changed circumstances, she did not meet her burden of demonstrating that it would be in the minors' best interests to be returned to her custody. (See *In re Michael D.* (1996) 51 Cal.App.4th 1074, 1086 [parent seeking modification under § 388 must prove a change in placement to parent's home is in minor's best interests].) All six minors had experienced chaos, abuse and neglect throughout their lives. V.W. often left them with the maternal grandmother and repeatedly exposed them to domestic violence. During their dependencies, the five youngest minors had been further traumatized by multiple placements

16

and separation from each other. They had been out of V.W.'s custody for more than two years and were in desperate need of a permanent living arrangement.

At the time of the hearing on the section 388 petition, the focus of the proceedings was on providing the minors with a safe, stable and permanent home, which the five youngest minors had found with the caregivers. (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317; *In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1507.) These children were together and thriving in this placement, and they wanted to continue living there. At this point in the proceedings, there was a rebuttable presumption that continued out-of-home care was in the minors' best interests. (*In re Marilyn H.*, *supra*, 5 Cal.4th at p. 310; *In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) Where, as here, " 'custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role. That need will often dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child.' " (*In re Stephanie M.*, at p. 317; *In re Mary G.* (2007) 151 Cal.App.4th 184, 204.) The court evaluated all of the evidence in light of the five youngest minors' needs for stability and security and the opportunity to stay together, and properly found that removing them from a stable and loving home and placing them with V.W. would not serve their best interests.

As to S.W., the evidence showed that she had lived most of her life with the maternal grandmother, whom she considered to be her mother. S.W. had been declared a dependent twice. During the current dependency, she had experienced approximately nine removals and different placements. S.W. was forced to take on the role of parent for her younger siblings. Although S.W.'s relationship with V.W. had recently begun to improve, it was too soon to return S.W. to a mother whose problems with substance abuse and domestic violence had not

17

been entirely ameliorated. Moreover, "[t]he presumption favoring natural parents by itself does not satisfy the best interests prong of section 388. The cases that state that a child may be better off with his or her biological parent rather than with strangers do so when the biological parent has shown a sustained commitment to the child and parenting responsibilities." (*In re Justice P., supra,* 123 Cal.App.4th at p. 192.) V.W. had not been committed to safely parenting S.W. for most of S.W.'s childhood. S.W.'s feelings that V.W. loved and supported her were not sufficient to support a finding that it was in S.W.'s best interests to be returned to V.W.'s custody.[8]

## II

V.W. contends that the court's finding that the beneficial parent-child relationship exception to adoption did not apply to the five youngest minors is not supported by substantial evidence.[9] She asserts that she regularly visited the minors; that she had a parental role in their lives; that her relationship with them, particularly Donovan and David, was positive and beneficial; and that the minors would be greatly harmed if V.W.'s parental rights were

---

[8]     The court ordered unsupervised visits between V.W. and S.W. Once V.W. is able to show that she can provide a home that is safe and free of substance abuse and domestic violence, the next step would be a 60-day visit with S.W., with the ultimate goal of placing S.W. with V.W. In other words, contrary to the suggestion in V.W.'s and S.W.'s briefing on appeal, the opportunity for S.W. to reunify with V.W. has not been foreclosed by the court's ruling on the section 388 petitions. Thus, it is not necessarily true that S.W. will "languish in long-term foster care with strangers."

[9]     Because parental rights were terminated only as to the five youngest minors, we refer to them throughout this section as the minors.

18

terminated. She further asserts that the court erroneously relied on the unenforceable promise of an open adoption to support its findings.[10]

A

After reunification services are terminated, the focus of a dependency proceeding shifts from preserving the family to promoting the best interests of the child, including the child's interest in a stable, permanent placement that allows the caregiver to make a full emotional commitment to the child. (*In re Fernando M*. (2006) 138 Cal.App.4th 529, 534.) At the selection and implementation hearing, the court has three options: (1) terminate parental rights and order adoption as the permanent plan; (2) appoint a legal guardian for the child; or (3) order the child placed in long-term foster care. (*Ibid*.)

"Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 573.) If the court finds that a child cannot be returned to his or her parent and is likely to be adopted if parental rights are terminated, it must select adoption as the permanent plan unless it finds that termination of parental rights would be detrimental to the child under one of the specified statutory exceptions. (§ 366.26, subd. (c)(1)(A) & (B)(i)-(vi); *In re Erik P*. (2002) 104 Cal.App.4th 395, 401.)

Section 366.26, subdivision (c)(1)(B)(i) provides an exception to the adoption preference if termination of parental rights would be detrimental to the child because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." We have interpreted the phrase " 'benefit from continuing the . . . relationship' " to refer to a parent-child relationship that "promotes the well-

---

10    Andre and R.S. join in this argument with respect to their children.

being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; accord, *In re Jason J.* (2009) 175 Cal.App.4th 922, 936.)

To meet the burden of proof for this statutory exception, the parent must show more than frequent and loving contact, an emotional bond with the child or pleasant visits. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.) The parent must show that he or she occupies a parental role in the child's life, resulting in a significant, positive emotional attachment from child to parent. (*Ibid.*; *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324.)

We review an order terminating parental rights for substantial evidence. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) If, on the entire record, there is substantial evidence to support the findings of the juvenile court, we uphold those findings. We do not consider the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is substantial evidence supporting a contrary finding. (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 53; *In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.) The parent has the burden of showing that there is no

20

evidence of a sufficiently substantial nature to support the finding or order. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

B

V.W.'s visitation and contact with the minors can fairly be characterized as regular. However, V.W. did not meet her burden of showing that there was a beneficial parent-child relationship that would overcome the legislative preference for adoption.

Before this dependency case was filed, it was the maternal grandmother or the paternal aunt, not V.W., who provided most of the day-to-day care for the minors. V.W. had not parented the minors for 28 months, except when Donovan and Estella stayed with her for a brief period in 2010. V.W.'s inability or unwillingness to address her substance abuse and domestic violence issues or to participate as a parent in the minors' lives prevented her from developing the type of parent-child relationship that could be deemed "beneficial" within the meaning of section 366.26, subdivision (c)(1)(B)(i). Thus, the well-being of the minors was not promoted by their relationship with V.W. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

Although David and Donovan were emotionally bonded to V.W. and initially wanted to return home to her and the maternal relatives, they eventually adjusted well to living with the caregivers, who provided them with "unconditional love, emotional support, and unlimited opportunities to succeed." Both boys wanted to stay in this placement, and said that they would be comfortable being adopted. As David's therapist noted, the stability, consistency and support that David was receiving from the caregivers had been, and would continue to be, an invaluable advantage in his emotional, social and cognitive development. In this regard, there

21

was no showing that David and Donovan would be greatly harmed if the parent-child relationship were severed. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; *In re Jason J.*, *supra*, 175 Cal.App.4th at p. 938.)

The love and affection that V.W. shared with Estella, Michael and Raymond during visits was not enough to show that terminating the parent-child relationship would result in great harm to these children. (*In re Jason J.*, *supra*, 175 Cal.App.4th at pp. 936-937; *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Although Estella, Michael and Raymond love V.W. and know that she is their mother, none of them had a "traditional" or "true" parent-child bond with her, and there was no evidence that they were negatively affected by her absence from their daily lives. "A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466; *In re Jason J.*, at p. 937.)

Further, V.W. has not shown that maintaining her relationship with the minors outweighed the benefits of adoption for them. At the time of the selection and implementation hearing, the minors had been out of V.W.'s care for more than two years. The minors were enjoying the consistency, nurturing and safety provided by the caregivers, who want to adopt all of them. Michael and Raymond were strongly bonded to the caregivers and Estella very much wanted them to adopt her. The minors' therapist, Denise Phipps, stated that without a plan of adoption, the minors were at risk of experiencing additional placements, additional traumas and attachment disruptions. Phipps said that the minors were also at risk of experiencing ongoing behavior problems and emotional and social delays if they were not

22

provided with permanence. She recommended that the minors have a stable home with parents who were capable of providing the care that the minors needed and deserved so that they could successfully move forward in their lives. Although V.W. believes that a permanent plan other than adoption would serve the minors' best interests, adoption is the only option that would provide this bonded sibling set with the stability and permanence that they so desperately need. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419 [Legislature has decreed guardianship is not in best interests of children who cannot be returned to their parents; only adoption affords the most permanent and secure alternative]; *In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368-1369 [parents' preference to preserve family unit does not override best interests of minors in stability and security of adoptive home].) There was substantial evidence to support the court's finding that the beneficial parent-child relationship exception did not apply to preclude terminating parental rights.

C

V.W. asserts that the social worker and the court improperly relied on the caregivers' unenforceable promise of an open adoption as a reason to ignore the "substantial evidence" that the minors would be greatly harmed if their relationship with V.W. was severed. Citing *In re S.B.* (2008) 164 Cal.App.4th 289, 300, V.W. asserts that it is improper to consider the prospect of postadoption contact when determining an exception to terminating parental rights. (See also *In re C.B.* (2010) 190 Cal.App.4th 102, 127-128.)

V.W. correctly notes that the juvenile court may not terminate parental rights when the beneficial parent-child relationship exception is established but there is an expectation that the prospective adoptive parents will permit future parent-child contact. (*In re C.B.*, *supra*, 190

23

Cal.App.4th at pp. 127-128 [juvenile court erroneously relied in part on expectation of further parent-child contact in assessing benefit of parent-child exception, finding that the harm to the children that would otherwise result from terminating parental rights would not actually occur because the children would continue to have parental contact].)  The purpose of the beneficial parent-child relationship exception is to protect that relationship when its continuation is more beneficial to the dependent child than a permanent plan of adoption would be.  In such a case, the court cannot allow the protection of the parent-child relationship to depend on "the hoped-for goodwill of the prospective adoptive parents."  (*Id*. at pp. 129, 128.)

Social worker Wrocklage believed that it was important that V.W. remain a part of the minors' lives.  She noted that visits with V.W. brought the minors comfort and joy.  Wrocklage properly reported, in her statutorily mandated assessment, that the caregivers were committed to adoption (§ 366.21, subd. (i)(1)) as well as to allowing postadoption contact between the minors and V.W.  Consequently, Wrocklage worked to develop a postadoption contact plan. (See §§ 358.1, 366.26, subds. (a) & (n), 366.29 & 16124; Fam. Code, § 8616.5, subd. (a) [Legislature declares some adoptive children may benefit from direct or indirect contact with birth relatives, including birth parents, after being adopted].)

The caregivers' proposal for future contact between V.W. and the minors was not the sole basis for Wrocklage's recommendation of adoption as the minors' permanent plans, and was not integral to that recommendation.  The record shows that the possibility of continued contact between the minors and V.W. was, in Wrocklage's view, ideal in this complex case involving six children, four of whom were over the age of six and had a bonded relationship with their mother, and one of whom objected to adoption.  Wrocklage's advocacy and vision of

24

postadoption contact did not, however, render her recommendation of adoption improper. Wrocklage assessed V.W.'s circumstances and the minors' best interests, including each child's relationship with V.W., and determined that adoption was the appropriate permanent plan for each of them. Indeed, Wrocklage testified at trial that she considered the possibility that the minors would no longer have contact with their biological family once they were adopted, and that under those circumstances, she would still recommend adoption for them.

There is nothing in the record to support V.W.'s claim that the court impermissibly relied on postadoption contact between V.W. and the minors in finding that the beneficial parent-child relationship exception to adoption did not apply. The caregivers voluntarily permitting future contact between the minors and V.W. was not essential to the court's termination of V.W.'s parental rights. (Cf. *In re C.B.*, *supra*, 190 Cal.App.4th at pp. 127-128; *In re S.B.*, *supra*, 164 Cal.App.4th at p. 300.) Instead, the court properly focused on whether severing the parent-child relationship would deprive the minors of a substantial, positive emotional attachment such that they would be greatly harmed, and whether the strength and quality of the parent-child relationship outweighed the benefits of adoption for these minors. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; *In re Jason J., supra,* 175 Cal.App.4th at p. 936.)

### III

V.W. contends that the court erred by not applying the beneficial sibling relationship exception to preclude terminating her parental rights. She asserts that the five youngest minors

were strongly bonded with S.W., and because S.W. was not going to be adopted, the only way to preserve the sibling bond was to allow V.W. to maintain her status as their parent.[11]

A

The sibling relationship exception to adoption applies when the juvenile court finds that there is a compelling reason for determining that terminating parental rights would be detrimental to the child because it would substantially interfere with that child's sibling relationship. (§ 366.26, subd. (c)(1)(B)(v).) Factors to be considered include the nature and extent of the relationship, whether the child was raised with a sibling in the same home and whether the child has strong bonds with a sibling. The court must also consider whether ongoing contact is in the child's best interests, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption. (*Ibid.*) The purpose of this exception is to preserve long-standing sibling relationships that "serve as anchors for dependent children whose lives are in turmoil." (*In re Erik P.*, *supra*, 104 Cal.App.4th at p. 404.)

"The sibling relationship exception contains strong language creating a heavy burden for the party opposing adoption." (*In re Daniel H*. (2002) 99 Cal.App.4th 804, 813.) Application of the sibling relationship exception requires a balancing of interests. (*In re L.Y.L.*, *supra*, 101 Cal.App.4th at p. 951.) The parent must first show that: (1) a significant sibling relationship exists; (2) terminating parental rights would substantially interfere with that relationship; and (3) it would be detrimental to the child if the relationship ended. (*Id*. at p. 952.) After the parent shows that a sibling relationship is so strong that its severance would

---

11     Andre and R.S. join in this argument to the extent it inures to their benefit with respect to their children.

26

be detrimental to the adoptive child, the court then decides whether the benefit to the child of continuing the sibling relationship outweighs the benefits of adoption. (*Id*. at pp. 952-953; *In re Naomi P.* (2005) 132 Cal.App.4th 808, 823.) We review the court's finding as to the applicability of this statutory exception to adoption for substantial evidence. (*In re D.M.* (2012) 205 Cal.App.4th 283, 293-294.)

B

The uncontroverted evidence showed that the five youngest minors were strongly bonded with each other, as well as with S.W., and that ongoing contact between the minors and S.W. was in the minors' best interests. The evidence also showed that reunification efforts with V.W. had failed, and that the minors, who were in a prospective adoptive home, were in great need of stability and permanence. The court weighed the evidence very carefully, noting that S.W.'s choice to forego adoption by the caregivers could not be used to "tip the scales" against a permanent plan of adoption for the minors. (See *In re Celine R.* (2003) 31 Cal.4th 45, 55 [although a nonadoptive sibling's emotional resistance to the proposed adoption of siblings is relevant to the interests of the adoptive child, it is not determinative].) After considering the significance of the sibling relationship, the court found that the benefits of adoption for the minors far outweighed maintaining the bond that they had with S.W. Nothing in the record supports V.W.'s contention that the court erroneously relied on the unenforceable promise by the caregivers to allow ongoing sibling visits between the minors and S.W. in making its

27

ruling.[12] There is substantial evidence to support the court's finding that the beneficial sibling relationship exception to adoption did not apply to preclude terminating parental rights.

*S.W.'s Appeal*

I

S.W. contends that the court erred by denying her section 388 petition, which sought to have all six minors returned to V.W.'s custody. Similar to V.W.'s petition, S.W.'s petition alleged that circumstances had changed because V.W. had made significant progress through services and was now capable of consistently caring for her children. S.W. further alleged that she will not be placed with the five younger minors, who are in a prospective adoptive placement, and that this will result in detriment because of the close sibling bond. S.W. claimed that it would be in the best interests of the minors to be reunited.[13]

As we have already held with respect to the same issue raised by V.W., the court did not abuse its discretion by finding that V.W.'s circumstances had not changed and that it was not in any of the minors' best interests to be returned to her custody. Although S.W.'s circumstances had changed because she was no longer living with her siblings, there was no showing that it was in S.W.'s or the siblings' best interests to be returned to V.W.'s custody.

S.W. argues that the court's finding as to changed circumstances is undermined by its further finding that V.W. had made enough progress to warrant unsupervised visits with her.

---

[12] In any event, it is not improper for the juvenile court to encourage the adoptive parents to agree to visits among the siblings, when appropriate, even though it cannot require them to do so. (*In re Celine R.*, *supra*, 31 Cal.4th at p. 55.)

[13] Andre and R.S. join in this argument to the extent it inures to their benefit with respect to their children.

28

We disagree. Because S.W. will not be adopted and wants to reunify with V.W., the court could reasonably find that it was in S.W.'s best interests to have unsupervised visits as the first step in the reunification process. However, the evidence showed that V.W. was not yet able to safely parent S.W. or the other minors on a day-to-day basis.[14] Thus, the juvenile court made a rational decision when it denied S.W.'s section 388 petition. (*In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318-319.)

We also disagree with S.W.'s contention that returning all of the children to V.W.'s custody is the only way to ensure their continued sibling relationship. As we have previously discussed, the evidence supported a finding that none of the minors could safely be placed with V.W., so that was not an option for the juvenile court. In denying S.W.'s section 388 petition, the court considered that the five youngest minors are together in a prospective adoptive home, and found that it would not be in their best interests to have a stable and permanent placement disrupted based on S.W.'s choice to not be adopted. Moreover, although there are no guarantees of postadoption contact between the five youngest minors and S.W., there is every indication that the caregivers will allow S.W. to be part of the family.[15] (§ 366.29, subd. (a)

---

[14] The evidence showed that during these proceedings, V.W. and S.W. had developed a better and closer relationship. Nevertheless, the court was presumably aware of the distinction in levels of care between placement and visits.

[15] S.W. claims that after she testified that she was opposed to the adoption of her siblings, her visitation with them was severely curtailed and she was no longer welcome in the caregivers' home. More specifically, the record reflects that visits between S.W. and her siblings became supervised (outside the caregivers' home) when S.W. began to sabotage the siblings' adoption by asking them to say that they did not want to be adopted. This caused the siblings to feel conflicted. Social worker Wrocklage was hopeful that once the stress of the trial was over, S.W. would resume frequent visits with her siblings, including overnight visits in the caregivers' home.

[providing for postadoption sibling contact agreements]; Fam. Code, § 8616.5 [providing for postadoption contact agreements with birth relatives, including siblings]; see also *In re Jacob S.* (2002) 104 Cal.App.4th 1011, 1019 [no evidence indicated relationship between the siblings would necessarily cease upon termination of parental rights].)[16]

## II

S.W. contends that the only way to avoid substantial interference with the bonded sibling relationship is to apply the sibling relationship exception to adoption. S.W. asserts that the court erred by finding that the benefits of adoption for the five youngest minors outweighed maintaining the sibling bond.[17]

We have already discussed the law and facts regarding the beneficial sibling relationship exception to adoption in V.W.'s appeal, and need not repeat them here. Although we recognize that sibling relationships are worthy of protection (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 998), we must apply a deferential standard of review and again conclude that there was substantial evidence to support the court's finding that the sibling relationship exception did not apply here.

---

[16]   S.W.'s reliance on *In re C.B.*, *supra*, 190 Cal.App.4th at pages 128-129 and *In re S.B.*, *supra*, 164 Cal.App.4th at page 300, is misplaced. Unlike the courts in those cases, the court here did not base its findings on an unenforceable promise of future visits by the prospective adoptive parents.

[17]   Andre and R.S. join in this argument to the extent it inures to their benefit with respect to their children.

## DISPOSITION

The orders are affirmed.

AARON, J.

WE CONCUR:


MCCONNELL, P. J.


MCINTYRE, J.